# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
　　　　**Plaintiff,**

　　v.　　　　　　　　　　　　　　　　　　　　Case No. 14-CR-84

**DARRY WORTHAM and TIANA ARNOLD**
　　　　**Defendants.**

---

## DECISION AND ORDER

The government charged defendants Darry Wortham and Tiana Arnold with participation in an animal fighting venture, contrary to 7 U.S.C. § 2156. Defendants filed motions to dismiss the indictment, arguing that § 2156 is unconstitutionally vague, and to suppress evidence seized from their residence. The magistrate judge handling pre-trial proceedings in this case issued a recommendation that the motion to dismiss be denied, and defendants have not objected, waiving their right to review. Fed. R. Crim. P. 59(b)(2). For the reasons stated in the magistrate judge's report and those reasons stated in my decision denying a similar motion in a related case, United States v. Brown, No. 14-CR-82, slip op. at 2-5 (E.D. Wis. Jan. 21, 2015), the motion to dismiss will be denied.

The magistrate judge held an evidentiary hearing on the motion to suppress, then issued a recommendation that the motion be denied. Defendants objected, and I referred the motion back to the magistrate judge to address an unresolved issue. The magistrate judge then issued a supplemental report, again recommending denial. Defendants again object. The matter is fully briefed and ready for decision. My review is de novo. Fed. R. Crim. P. 59(b)(3). De novo review does not require a de novo hearing, even when witness credibility is at issue.

See United States v. Raddatz, 447 U.S. 667, 673-76 (1980). Neither side asks for a new hearing in this case, and I find the record developed before the magistrate judge sufficient to rule.[1]

**I.**

The magistrate judge's reports set forth the facts adduced at the evidentiary hearing. I present an abbreviated version herein.

On June 10, 2011, Milwaukee police officers went to defendants' home, a duplex where defendants lived in the upper unit and Wortham's mother and brother the lower, to conduct a knock and talk following a tip that Wortham was selling marijuana and involved in dog fighting. Based on information that drugs were sold from the rear of the house, officers knocked on the back door, which was answered by Wortham's brother. While speaking to Wortham's brother, one of the officers heard a toilet flush, leading the officers to believe someone may be trying to destroy evidence, so they entered the rear common hallway or foyer. Before they got more than a few steps inside (less than 10 feet), the officers saw a Pit Bull on the top landing by the upper unit. They retreated and yelled for someone to secure the dog, which Wortham did. Wortham testified that the officers told him to "put the dog away before we shoot it." (R. 68 at 116.) The officers denied threatening to shoot the dog.

The officers testified that after Wortham put the dog away he came back out to the hallway, and the officers asked for permission to come up to Wortham's unit and talk, which Wortham granted. Wortham testified that after he put the dog away he opened the door to his unit, and the officers were already up the stairs and simply came into his apartment.

---

[1] Arnold moves to adopt Wortham's motions and join in his submissions. I will grant that request.

2

It is undisputed that after the officers entered the unit Wortham gave consent to search. The officers did not draw their weapons, shout at Wortham, push him around, handcuff him, or threaten him or Arnold. Wortham admitted that no one twisted his arm or intimidated him into consenting. The officers found marijuana, which they used to obtain a search warrant, recovering additional evidence for use in this case.[2]

In her first report, the magistrate judge agreed with defendants that exigent circumstances did not support the initial entry into the duplex. The toilet flushing may have suggested destruction of evidence, creating an exigency, but in order to enter the police also needed probable cause, which the government conceded the officers did not have. See United States v. Venters, 539 F.3d 801, 806-07 (7th Cir. 2008) (stating that the Fourth Amendment permits "an officer to enter a house without a warrant where there is (1) probable cause supporting the entry; and (2) exigent circumstances."). However, the magistrate judge found that, despite the initial illegal entry into the building, Wortham voluntarily consented to the search. See United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003) ("Where the search following the illegal entry is justified based on alleged consent, courts must determine whether that consent was voluntary, and in addition the court must determine whether the illegal entry tainted that consent.").

As to voluntariness, the magistrate judge noted that Wortham, then in his twenties, appeared intelligent and had prior experience with the law;[3] the officers did not brandish

---

[2]Defendants moved to suppress the evidence gathered pursuant to the warrant under Murray v. United States, 487 U.S. 533 (1988). See also United States v. Markling, 7 F.3d 1309, 1316-17 (7th Cir. 1993).

[3]Specifically, he has a prior conviction for selling marijuana, for which he was on probation at the time of the search.

3

weapons, issue threats, shout, or handcuff Wortham; and he consented immediately upon being asked. See United States v. Biggs, 491 F.3d 616, 621 (7th Cir. 2007) (considering the age, education, and intelligence of the defendant; whether he was advised of his rights; the length of detention prior to consent; whether he consented immediately or police made repeated requests; whether physical coercion was used; and whether the defendant was in custody). The magistrate judge noted that while a total of ten officers responded to the duplex, Wortham primarily interacted with just one. Finally, the magistrate judge concluded that the officers' command to secure the dog did not render Wortham's consent involuntary. Wortham made no claim that he consented due to fear for his dog's safety, or that he otherwise felt intimidated or coerced.

The magistrate judge further found that the initial illegal entry did not taint the consent. See United States v. Conrad, 673 F.3d 728, 733 (7th Cir. 2012) (explaining that when consent follows an illegal entry the court considers the time elapsed between the illegality and the acquisition of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct). While the consent followed closely after the entry (about three minutes later), the appearance of the dog and the officers' retreat from the duplex constituted an intervening event, and the violation – a brief entry into what appeared to be a common area in response to a perceived exigency – was not flagrant.[4]

In their initial objections, defendants contested the magistrate judge's findings that Wortham voluntarily consented and that the illegal entry did not taint the consent. They also

---

[4]Before the magistrate judge, the parties agreed that the duplex functioned like a single family home, and that defendants had an expectation of privacy in the common areas. However, the police were not at the time of the entry aware of how the duplex functioned.

4

noted that the magistrate judge failed to resolve the factual dispute as to whether, after Wortham put the dog away, the officers entered the upper unit of the duplex without consent; the government agreed with this point, so I referred the matter back to the magistrate judge for a finding on the issue.

In her supplemental report, the magistrate judge found the officers more credible, rejecting defendants' argument that any embellishments in the officers' reports rendered their testimony suspect. At the hearing, the officers consistently testified that Wortham gave them permission to come up and enter the unit. The magistrate judge further noted Wortham's overall cooperativeness with the police. After putting the dog away, rather than withdrawing into his apartment, he came back out into the hallway to engage with the officers. He then promptly consented to a search of his unit. The magistrate judge found Wortham's claim that he did not give the police permission to enter his unit incongruous with his other conduct and attitude during the interaction with the police. Finally, the magistrate judge found it implausible that the officers, after retreating at the sight of the Pit Bull on the landing, would then force their way into the unit where Wortham put the dog. Defendants filed supplemental objections to these findings.

**II.**

In their objections, defendants argue that (A) the officers entered their unit without consent, (B) the officers' illegal entry (of the building and the unit) tainted Wortham's consent to search, and (C) Wortham's consent was not voluntary. I address each argument in turn.

**A.      Entry into Defendants' Unit**

Defendants contend that the officers embellished their testimony and their reports,

diminishing their credibility. However, I agree with the magistrate judge that defendants point to nothing of significance. The reports refer to the officers' source of information as a "concerned citizen," when the person had actually been arrested, but defendants make no claim that the officers invented the source or the information s/he provided. The reports indicate that Wortham replied, "Come on in!" when asked for consent to enter, but I cannot place much weight on the punctuation mark the officers used. At the hearing, the officers consistently testified that Wortham invited them in. Finally, defendants complain that one of the officers referred to "toilets" (plural) being flushed, but as the magistrate judge noted this was likely inadvertence and, at all events, it is undisputed that a toilet was flushed.[5] (R. 68 at 133.)

Defendants also fault the magistrate judge for relying on Wortham's cooperativeness, arguing that his acquiescence to the officers' commands should not be confused with assistance. Defendants further note that they have never argued that Wortham refused entry into his unit; rather, their position is that the officers came in without even asking. However, defendants have no response to the magistrate judge's finding that it would have been implausible for the officers to barge into the unit where the intimidating dog they just told Wortham to secure awaited. As the government notes, there is also no indication in the record that the officers wanted to barge in and immediately begin searching. Rather, they wanted to

---

[5]Defendants also point to the participation of officers from the Fifth District later terminated for conducting unlawful strip searches. However, they fail to persuasively link these officers to the illegality alleged in this case. As the magistrate judge noted at the hearing, these officers played no role at the back door or in getting consent. (R. 68 at 61.) The primary officers involved in obtaining the consents in this case have not been charged with misconduct.

6

obtain consent.[6] It makes little sense that they would enter the unit without asking but then seek permission to search.

The magistrate judge's discussion of Wortham's cooperativeness bolsters her finding that Wortham voluntarily consented to entry, as he did the search. I agree that Wortham's consent to enter the unit was voluntary. He immediately agreed on the officers' first request; the officers did not draw their weapons, threaten him, or place him in handcuffs; and Wortham's characteristics suggest that his consent was voluntary. Nothing in the record supports a contention that the police claimed authority to enter, to which Wortham merely acquiesced. Nor is there any evidence that Wortham objected to the officers' entry. In sum, I agree with the magistrate judge that the officers sought and obtained consent before entering defendants' unit.

**B.     Impact of the Initial Entry on Consent**[7]

Defendants next take issue with the magistrate judge's finding that the appearance of the dog and the officers' withdrawal from the house constituted an intervening event. They argue that this is not the sort of circumstance, like release from custody, consultation with

---

[6]Defendants argue that, once they heard the toilet flush, the officers believed they had exigent circumstances allowing them to enter, which bolsters the claim that the officers simply waltzed into the unit without asking. However, this ignores the appearance of the dog, after which the officers withdrew for their safety. The officers then proceeded with consent.

[7]The government argues that the officers' initial entry into the building was not unlawful, as the officers reasonably, albeit mistakenly, believed they were entering a common area where defendants had no expectation of privacy. Like the magistrate judge, I will assume the initial entry was illegal and consider the officers' beliefs in evaluating the flagrancy of the violation. As the magistrate judge further recognized, the timing supports defendants, as Wortham consented just a few minutes after the initial entry. However, because there is no bright-line test for temporal proximity, it is often helpful to consider this factor in conjunction with the presence of intervening circumstances. See, e.g., United States v. Reed, 349 F.3d 457, 464 (7th Cir. 2003) (citing United States v. Fazio, 914 F.2d 950, 958 (7th Cir. 1990)).

7

counsel, or presentation to a magistrate judge, that would suffice to purge the primary taint. However, the cases upon which defendants rely primarily involved confessions obtained after an unlawful arrest and thus offer little guidance in this case, where Wortham had not been arrested or handcuffed at the time he gave consent.

The importance of the intervening event here – the appearance of the dog – is that it stopped the officers in their tracks, terminating the initial entry. The officers withdrew and then proceeded upstairs only after they had obtained permission. In a very real sense, these events severed the connection between the initial entry into the building and the officers' later discovery of the evidence inside defendants' unit. See Reed, 349 F.3d at 464 (explaining that the "type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal [act] and the discovery of the evidence").

Regarding the flagrancy of the violation, defendants note that suppression is not limited to those instances in which the police act in an outright threatening manner. Id. at 465. However, they fail to address the comparatively innocuous facts of this case, where the initial entry was brief, lasting just a few seconds; the officers made it less than ten feet inside the building, into what they reasonably believed to be a common area, never entering defendants' living space; and they then sought permission, while outside defendants' unit, before proceeding upstairs. The officers recovered no evidence based on the initial entry into the foyer. The flagrancy factor is considered the most important because it is tied directly to the rationale underlying the exclusionary rule – deterrence of police misconduct. Id. at 464-65. Because the officers reasonably believed they had entered an area where defendants had no expectation of privacy, see United States v. Villegas, 495 F.3d 761, 767-68 (7th Cir. 2007), the

flagrancy of the violation was minimal.[8]  For these reasons and those stated by the magistrate judge, I find that the initial entry did not taint the later acquired consent.

## C. Voluntariness of Consent

In their objections, defendants say little about voluntariness, arguing only that the magistrate judge failed to give sufficient weight to the officers' alleged threat to shoot the dog, the number of officers involved, the officers' failure to advise Wortham that he could refuse consent, and their unlawful presence in the home at the time.  As the magistrate judge noted, Wortham essentially admitted that the officers' commands regarding the dog did not induce his consent.  While numerous officers were on site, just one solicited the consent; Wortham was not confronted by the intimidating presence of numerous officers at the time.  Failure to advise a defendant that he can refuse, although a consideration, does not render consent involuntary. See United States v. Price, 54 F.3d 342, 347 (7th Cir. 1995).  Finally, as discussed above, the officers did not unlawfully enter defendants' unit.

For these reasons and those stated by the magistrate judge, including Wortham's characteristics, his immediate grant of consent, and the absence of any threatening or coercive conduct by the officers, I find that Wortham voluntarily consented to the search.[9]

---

[8]Defendants indicate that, after the officers withdrew at the sight of the dog, they again entered the rear door.  Defendants argue that this constituted a second illegal entry, eliminating any dissipating impact the intervening circumstance may have had on the taint.  As noted, however, the officers reasonably believed this to be a common hallway, and they immediately sought Wortham's consent before proceeding up to his unit.

[9]The government also makes an inevitable discovery argument based on the consent later obtained from Wortham's mother.  Because I deny the motion for the reasons stated in the text I need not address this argument.

**III.**

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 60) is adopted, and defendants' motion to dismiss (R. 42) is **DENIED**.

**IT IS FURTHER ORDERED** that the magistrate judge's recommendations (R. 70, 90) are adopted, and defendants' motions to suppress (R. 41, 51) are **DENIED**.

**FINALLY, IT IS ORDERED** that defendant Arnold's motion to adopt defendant Wortham's motions (R. 55) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge